UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: ALEX ELI ALVAREZ, Debtor. | Case No.: 1–24–41674-JMM<br>Chapter 7 |
| ALEX ELI ALVAREZ, Plaintiff, -Against- UNITED STATES DEPARTMENT OF EDUCATION, THE STUDENT LOAN CORPORATION, SOUTHWOOD FINANCIAL TRUST I, Defendants. | Adv. Proc. No.: 1-24-01074-JMM |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S OBJECTION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

THE LEGAL AID SOCIETY
Natalie Jean-Baptiste, Esq.

153-01 Jamaica Avenue
Suite 202
Jamaica, NY 11432
(646) 988-0567 Telephone
(646) 449-6808 Facsimile
nljean-baptiste@legal-aid.org
*Attorneys for Plaintiff*

Plaintiff, by and through undersigned counsel, submits the combined memorandum of law in response to all of Defendants' motions for summary judgment.

## PRELIMINARY STATEMENT

Plaintiff Alex Eli Alvarez, a first-generation American with big dreams of becoming a curator for artists of color, incurred debts owed to Defendants in pursuit of a Art History degree. Despite successfully completing the program and earning her Bachelor's degree, she has struggled for years to find work in her field and currently works as a stationary store clerk earning an annual salary of approximately $23,000. The Plaintiff is indebted to defendants for over $126,000, the bulk of which are predatory private loans where defendants deliberately bypassed the school's financial aid office and relied on self-certification by unsophisticated student borrowers as a lending model. The private loans at issue are not qualified loans protected from discharge. Furthermore, Plaintiff faces undue hardship, impacting her ability to support herself if the debts owing to Defendants are not discharged.

## STANDARD FOR SUMMARY JUDGMENT

Summary judgment is improper where there exist genuine disputes as to material facts. See Fed. R. Civ. P. 56(c) (made applicable by Fed. R. Bankr. P. 7056). The moving party bears the burden of showing the absence of any genuine issue of material fact. See *Celotex Corp v. Catrett*, 477 U.S. 317, 323 (1986). In evaluating a motion for summary judgment, the Court must "view[ ] the record as a whole and in the light most favorable to the nonmoving party". *Clark v. Alexander*, 85 F.3d 146, 150 (4th Cir.1996).

Summary judgment is appropriate when the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party. See *Anderson v. Liberty Lobby, Inc*., 477

U.S. 242, 247-49 (1986). In other words, Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322. Plaintiff raises genuine issues of material fact and her ability to repay and future financial condition remain in dispute, therefore summary judgment should be denied.

**Summary Judgment Must Be Denied Because Southwood Financial Has Failed to Prove the Private Loans Are "Qualified Education Loans"**

§ 523(a)(8)(B) excepts from discharge "any other educational loan that is a qualified education loan, as defined in §221(d)(1) of the Internal Revenue Code of 1986, incurred by a debtor who is an individual." 11 U.S.C. § 523(a)(8)(B). The Internal Revenue Code defines a "qualified education loan" as indebtedness incurred *solely* to pay qualified higher education expenses, which are limited to the "cost of attendance" at an eligible educational institution, *after reduction by scholarships and other aid.* 26 U.S.C. §221(d) (1) – (2).

Here, Southwood's own evidence demonstrates that the loans in question were *self-certified* outside of any formal financial aid office process and were in amounts that exceeded the cost of attendance (including tuition, fees, books, supplies and other qualified components). Under the statutory definition, amounts in excess of the cost of attendance are not qualified higher education expenses," and debt incurred for such excess purposes cannot constitute a "qualified education loan" under §523(a)(8)(B) a loan used for non-qualified purposes (e.g., living expenses not required for attendance beyond cost of attendance) is outside the scope of the statutory exception and therefore dischargeable.

**The Southwood Loans Functioned as Direct-to-Consumer Credit Products, Not Traditional Educational Loans**

The structure of the Sallie Mae Loans (Southwood Financial LLC's predecessor in interest) undermines the defendant's claim that they qualify as protected educational loans under § 523(a)(8)(B). Unlike traditional education loans administered through a school's financial aid office, the loans at issue:

- Were self-certified by Plaintiff;
- Were disbursed without school verification of the cost of attendance;
- Required a co-signer
- Were underwritten and approved using criteria indistinguishable from ordinary consumer credit

Plaintiff's sister, just a few years her senior- who had no legal or financial obligation to support Plaintiff's education and was neither a parent nor legal guardian – was required to co-sign the loans. This feature is emblematic of direct-to-consumer lending, not institutional educational financing. The requirement of a co-signer unrelated to the student's educational dependency status underscores that Sallie Mae treated these loans as *credit-risk* products, not need-based or cost-constrained educational loans.

Courts examining § 523(a)(8) have emphasized that Congress intended to protect narrowly defined educational financing, not private credit products merely branded as "student loans". *Homaidan*, 3 F.4th at 601-02. Where a loan bears the hallmarks of

consumer lending credit underwriting, cosigner requirements and lack of institutional oversight it falls outside of heartland of § 523(a)(8) nondischargeability protections.

**Sallie Mae's Lending Practices Preclude Southwood from Meeting Its Burden Under 523(a)(8)(B)**

Sallie Mae's decision to bypass the school's financial aid office, forego verification of other aid received, and issue loans in excess of documented educational costs reflects a deliberate business model that shifts risk onto borrowers while preserving a post-bankruptcy collection advantage. Having elected to operate outside traditional educational safeguards, Defendant cannot now invoke § 523(a)(8)(B) while simultaneously disclaiming responsibility for maintaining the very records required to prove eligibility under that statute.

Section 523(a)(8)(B) incorporates the Internal Revenue Code's definition of "qualified education loan," which requires that the indebtedness be incurred solely for qualified higher education expenses and limited to the cost of attendance *minus other aid received*. 26 U.S.C. § 221(d)(1)-(2). Where a lender cannot establish what aid was received, what the cost of attendance was, or how loan proceeds were constrained to that cost, the lender necessarily fails to satisfy the statutory definition. This is not a technical deficiency- it goes to the core of the statutory inquiry a lender that elects speed and volume over verification assumes the risk that its loans will be treated as ordinary unsecured debt in bankruptcy.

Defendant's motion rests almost entirely on Plaintiff's post-hoc recollection of the financial aid she may have received while enrolled, rather than on objective, contemporaneous financial aid records from the educational institution itself. Critically, defendant does not offer financial aid award letters, cost-of-attendance calculations, or school-certified records

substantiating its claim that the loans fell within the applicable cost of attendance. Private student loan creditors bear the burden of proving that the loan is a qualified loan.

**Sallie Mae's Conduct Exemplifies the Type of Private Lending Congress Did Not Intend to Protect**

While Plaintiff need not prove "predatory lending" to prevail, the record reflects a lending scheme that bears all the indicia of exploitive private student lending: self-certification, lack of institutional oversight, co-signer requirements untethered to educational dependency, and loan amounts exceeding demonstrable educational need.

This is precisely the type of private lending Congress did not intend to insulate from bankruptcy relief. As emphasized in *Homaidan v. Sallie Mae, Inc*., 523(a)(8) must be construed narrowly to avoid transforming all education-related consumer credit into nondischargeable debt.3 F.4th at 602-03(2d Cir. 2021). Allowing Sallie Mae (Southwood) to prevail here would incentivize lenders to abandon institutional oversight, inflate loan amounts beyond cost of attendance, and later invoke nondischargeability without proof- effectively converting §523(a)(8)(B) into a safe harbor for reckless private lending.

Sallie Mae's business choices created the evidentiary vacuum Southwood now asks the court to overlook. The Bankruptcy Code does not reward such conduct. Where a lender elects to operate outside statutory safeguards and fails to preserve proof of compliance, the resulting debt must be treated as ordinary unsecured credit, fully subject to discharge.

**Sallie Mae's Portfolio Transfers and Risk-Shifting Practices Further Undermine Any Claim to 523(a)(8)(B) Protection**

Sallie Mae’s handling of its private student loan portfolios provides additional context for why the loans at issue should not be afforded the extraordinary protection of nondischargeability. Publicly available disclosures and industry practice reflect that Sallie Mae has routinely sold, transferred, for securitized large segments of its private student loan portfolio, particularly higher risk loans, as part of this broader risk management and compliance strategy. These transactions allowed the lender to monetize private student loan debt while distancing itself from long term exposure and heightened regulatory scrutiny associated with nontraditional student lending.

Business model matters here because it underscores the fundamentally *commercial and speculative nature* of the loans at issue. Sallie Mae knowingly originated private, self-certified loans outside the financial aid process, and amounts untethered to verified cost of attendance, and with cosigners then treated those loans as transferable financial assets rather than as institutionally supervised educational financing. Such conduct is inconsistent with the type of carefully constrained educational lending Congress sought to protect under Section 523(a)8.

Having structured and marketed these loans as high-risk tradable consumer credit Sallie Mae’s successor in interest cannot now selectively invoke the Bankruptcy Code’s narrow non dischargeability exception while disclaiming the corresponding obligations of documentation, verification, and statutory compliance. Section 523A8 was not intended to function as a post hoc insurance policy for private lenders whose aggressive origination and risk distribution strategies and later seek to externalize the downside exclusively onto borrowers.

Moreover, Southwood’s, Sallie Mae's successor in interest, inability to produce basic cost of attendance and financial aid records is not accidental it is a foreseeable consequence of a lending model designed for volume, transferability, and risk shedding, rather than long term compliance

with the Internal Revenue Code's definition of a qualified education loan. Where a lender elects to profit from such a model it must also bear the consequences when it cannot meet its burden under Section 523(a)(8)(B).

As the Second Circuit cautioned in *Homaidan*, courts must resist interpretations of 523(a)(8) that would convert broad categories of private consumer credit into presumptively non dischargeable debt extending non dischargeability here would do precisely that -rewarding A lender for structuring transferring and monetizing private student loans while depriving the debtor of the bankruptcy codes core fresh start protections.

**Plaintiff Cannot Maintain a Minimal Standard of Living if Forced to Repay the Student Loans**

Plaintiff cannot maintain, based on current income and expenses, a minimal standard of living for herself if forced to repay the student loans. In determining whether a debtor satisfies the first prong of the *Brunner* test, courts "examine current income and expenses and determine, through the application of common sense, a minimal standard of living level which is sensitive to the particular circumstances of each case." *Pincus v. Graduate Loan Ctr.* (*In re Pincus*), 280 B.R. 303, 317 (Bankr. S.D.N.Y. 2002) (citing *Elmore v. Mass. Higher Educ. Assistance Corp. (In re Elmore*), 230 B.R. 22, 26 (Bankr. D. Conn. 1999)). The first prong "does not require the debtor to live at or below the poverty level." *Id*. See also *Jackson v. The Educ. Res. Inst.* (*In re Jackson*), Adv. No. 06-01433, 2007 WL 2295585, at *5 (Bankr. S.D.N.Y. Aug. 9, 2007) (same). In applying this prong his Honor considered whether the debtor's expenses are below the amounts the Internal Revenue Service (the "IRS") considers reasonable and necessary in determining the monthly amount a taxpayer can access from earnings to pay delinquent taxes, as

set forth in its *Housing and Allowable Living Expenses* publication. *Jane Doe v. Educ. Credit Mgmt. Corp.* (*In re Doe*), 325 B.R. 69, 78 (Bankr. S.D.N.Y. 2005). The court must also consider whether the debtor has made an effort to maximize her financial resources. *In re Meyers*, 150 B.R. 139, 143 (Bankr. W.D. Pa. 1993).

Plaintiff has taken reasonable steps to reduce her expenses and maximize her financial resources. Plaintiff currently lives in a studio apartment in Brooklyn and pays only $1,310 for rent. The allowable rent expense for Kings County is $2,477, nearly double the Plaintiff's expense on rent. All of Plaintiff's current monthly expenses are below the amounts set forth in the IRS's collection financial standards, available at http://www.irs.gov/Individuals/Collection-Financial-Standards. and attached as Exhibit 1. At the very least, housing and transportation are required to maintain a minimum standard of living and the amounts allowed by law would render Plaintiff unable to afford the minimum payment on her student loans.

Plaintiff earns just over $23,000 annually and she barely cover her basic necessities *without* the student loan payments. The minimum monthly payments on the student loan debts total over $1,000 monthly, almost as much as Plaintiff's monthly rent payment for her studio apartment. Even if Plaintiff can secure a better paying job in the future, it's not likely she will be able to maintain a minimal standard of living for herself *and* keep up with the minimum payments. The cost of housing, food and other necessities are going up, exacerbating the problem. Furthermore, she doesn't have any assets that can be liquidated to repay the loans and nothing saved for retirement.

**Additional Circumstances Indicate That Plaintiff's Financial Situation is Likely to Persist**

Defendants argue that Plaintiff cannot establish a likelihood of persistently insufficient income under the second prong of the Brunner Test. That prong requires a debtor to show that "additional circumstances exist indicating that the debtor's present economic duress is likely to persist for a significant portion of the repayment period", and that the inability to pay is because of factors beyond the debtor's control.

Defendants' position is that Plaintiff does not satisfy the additional circumstances prong because she is only 25 years old and does not suffer from any disability or medical condition. Defendants narrow view that only medical condition that limits her ability to work can satisfy the second Brunner prong is inconsistent with how courts interpret "additional circumstances". While many successful undue hardship cases involve medical burdens, neither the statute nor Second Circuit precedent conditions relief on such factors alone. The Second Circuit has never held that medical disability or advanced age are prerequisites to demonstrating additional circumstances. Rather, the inquiry is whether objective, identifiable barriers exist that make it unlikely the debtor's financial condition will materially improve during the repayment period. *Brunner v. N.Y. State higher Educ. Servs. Corp*., 831 F.2d 395, 396 (2d Cir. 1987). Courts examining undue hardship have considered the debtor's lack of marketable job skills, underemployment, limited education and poor earnings potential as relevant non-exhaustive factors indicating that the debtor's financial situation is unlikely to improve significantly.

Courts have expressly rejected the notion that youth alone establishes future repayment capacity, recognizing that structural limits on income, health considerations and economic realities may

constrain a debtor's prospects, regardless of age. See *In re: Traversa*, 444 F. Appx 472, 474 (2d Cir. 2011) (requiring a "realistic look" at debtor's circumstances, not speculative optimism).

**Plaintiff's Art History Degree Has Not Produced, and Is Unlikely to Ever Produce, Sustainable Income**

Plaintiff holds a Bachelor's degree in Art History and Media & Arts Management. Despite years of diligent effort, she has been unable to secure employment in her field of study. This is not the result of lack of motivation or effort, but rather the severely limited labor market for art history graduates without advanced degrees, institutional access, or financial support.

Courts applying *Brunner* have repeatedly recognized that a debtor's lack of marketable or economically viable job skills, combined with persistent underemployment, constitutes an "additional circumstance" demonstrating that the hardship is likely to persist. See Traversa. In re Rosenberg, 610 B.R. 454 461-62 (Bank. S.D.N.Y. 2020), recognizing that limited income prospects and lack of realistic improvement satisfy Brunner's second prong. Unlike degrees that lead to defined professional pipelines, Plaintiff's degree has proven economically sterile. The mere possession of a college degree does not equate to earning capacity, and the Bankruptcy Code does not require courts to indulge *speculative optimism* that a debtor's education *might* someday translate into meaningful income.

**Plaintiff's Current Employment as a Stationary Store Clerk Reflects Chronic Underemployment, not a Temporary Setback**

Plaintiff currently works as a clerk at Lismar Cards, a stationary store, employment that bears no relation to her field of study and offers low wages, limited hours, and no opportunity for

advancement. This position reflects chronic underemployment, not a transitional phase. Courts have emphasized that the second *Brunner* prong looks to whether the debtor's financial condition is likely to persist for a significant portion of the repayment. Plaintiff's work history demonstrates precisely that. Years after graduation, despite active job searching, she remains locked into low-wage retail work. There is no evidence, nor do Defendants offer any that her earnings are likely to increase to a level sufficient to service her student loan debt while maintaining a minimal standard of living.

Importantly, courts have rejected the notion that youth alone implies future earning capacity. "The test is not whether the debtor is young enough to retrain or theoretically capable of earning more but whether there is a realistic prospect that such improvement will occur." *Rosenberg*, 610 B.R. at 462.

**Plaintiff Lacks Resources to Retrain or Pivot into a New Profession**

Defendants' argument implicitly assumes that Plaintiff can simply pivot into a more lucrative career. The assumption ignores economic reality Plaintiff lacks the financial resources to return to school, pursue graduate education or obtain vocational training that could meaningfully improve her employment prospects

Courts recognized that the inability to afford retraining or further education is itself an additional circumstance, particularly where the debtor is already burdened by substantial student loan debt period requiring plaintiff to incur more educational that in the speculative hope of higher earnings would be antithetical to the fresh start principles of the Bankruptcy Code moreover Plaintiff's existing student loan obligations act as a self-perpetuating barrier they limit her disposable income restrict access to credit and foreclose the very opportunities defendants

suggests might improve her prospects. This circular trap where debt prevents the means of escape from debt is precisely what §523(a)(8) is not intended to eternalize.

**Plaintiff Has Made Good Faith Efforts To Repay Her Loans**

Plaintiff has made good faith efforts to repay her student loans. "Good faith consists of the debtor's efforts to obtain employment, maximize income, and minimize expenses. *Educ. Credit Mgmt. Corp. v. Mosko (In re Mosko)*, 515 F.3d 319, 324 (4th Cir.2008) (quoting *O'Hearn v. Educ. Credit Mgmt. Corp. (In re O'Hearn*), 339 F.3d 559, 564 (7th Cir.2003) (internal quotation marks omitted) (emphasis added)).

Plaintiff has consistently demonstrated good faith efforts to repay her student loans. After receiving her Bachelor's degree, she submitted hundreds of applications to galleries, auction houses, and other employers in the arts sector.

BRUNNER TEST IS OBSOLETE

While *Brunner* remains binding, it must be applied consistently with the Bankruptcy Code's foundational purpose to provide honest but unfortunate debtors a meaningful fresh start. *Local Loan Co. v. Hunt,* 292 U.S. 234, 244 (1934). When *Brunner* was decided in 1987, student loan debt was modest, repayment methods were limited, and lifelong indebtedness was not the norm. Today, debtors like Plaintiff face ballooning balances, stagnant wages and degrees that do not yield sustainable employment, yet are still required to demonstrate a level of certainty about lifelong hardship that no other class of debtor must meet.

Courts have increasingly cautioned against turning *Brunner* into an insurmountable barrier to relief period as noted in *In re: Rosenberg* 610 BR 454 (Bankr. S.D.N.Y. 2020), overly

punitive interpretations distort *Brunne*r beyond its intent. Exceptions to discharge must be narrowly construed. Here, rigid application would deny Plaintiff the very relief bankruptcy is designed to provide.

Summary judgment should be particularly disfavored in student loan discharge cases because the Brunner inquiry requires forward-looking, fact-intensive assessment of debtor's realistic future prospects. When applied rigidly at the summary judgment stage, the Brunner Test risks functioning not as an equitable standard but as a categorical barrier to relief, effectively demanding certainty of lifelong hardship based on speculative assumptions about future earning capacity. Consistent with the Bankruptcy Code's fresh start mandate and Rule 56's requirement that all reasonable inferences be drawn in favor of the non-moving party, close factual questions under §523(a)(8) should be resolved at trial, not foreclosed through summary judgment by an overly mechanistic application of *Brunner*.

For these reasons, Plaintiff respectfully requests that the Court deny Defendants motions for summary judgment in their entirety and permit this matter to proceed to trial.

Dated: February 6, 2026
Jamaica, New York

THE LEGAL AID SOCIETY

By: *<u>/s/ Natalie Jean-Baptiste</u>*
Natalie Jean-Baptiste, Esq.

153-01 Jamaica Avenue
Suite 202
Jamaica, NY 11432
(646) 988-0567 Telephone
(646) 449-6808 Facsimile
nljean-baptiste@legal-aid.org